**UNITED STATES of America,**
**Plaintiff,**

v.

**Keith Lamar ORANGE, Defendant.**

**No. CR–98–44–L.**

United States District Court,
W.D. Oklahoma.

Feb. 22, 2005.

Keith L. Orange, El Reno, OK, pro se.

Kerry A. Kelly, Michael James, William L. Borden, Jr., U.S. Attorney's Office–OKC, Oklahoma City, OK, for Plaintiff.

Gary S. Peterson, McKinney & Stringer–OKC, Stanley S. Parsons, Oklahoma City, OK, for Defendant.

## MEMORANDUM OPINION

LEONARD, District Judge.

On March 18, 1998, a federal grand jury returned a ten count indictment against defendant and Victor Cooper. Defendant was charged in six counts with conspiring to file and filing false claims for income tax refunds with the Internal Revenue Service in violation of 18 U.S.C. §§ 286–287. On August 27, 1998, a jury returned a verdict of guilty as to all six counts. Defendant was thereafter sentenced to concurrent prison sentences, the longest of which was 78 months, and a three-year term of supervised release. The Court of Appeals for the Tenth Circuit affirmed defendant's conviction and sentence in an unpublished opinion issued June 12 2000. *United States v. Orange*, 215 F.3d 1338, 2000 WL 757735 (10th Cir.), *cert. denied,* 531 U.S. 939, 121 S.Ct. 332, 148 L.Ed.2d 267 (2000).

On October 11, 2001, defendant moved to vacate his sentence pursuant to 28 U.S.C. § 2255. Defendant presented five grounds for relief, including that his court-

appointed counsel was ineffective for failing to challenge this district's jury selection system. Specifically, defendant argued that use of voter registration lists to compile qualified grand and petit juries unlawfully excluded minorities. The court denied defendant's motion on March 28, 2002, holding that "[t]he method used in this district has been repeatedly upheld by the court of appeals. Although none of these cases originated here, Mr. Orange does not contend that the ethnic population of this district differs significantly from that of other districts that employ this same jury selection system. His challenge is based on mere speculation and conjecture." *United States v. Orange,* Case No. CR–99–44–L, Order at 4 (W.D.Okla. Mar. 28, 2002) (Alley, J.) (citations omitted). This court's decision was initially affirmed on appeal. *See United States v. Orange,* 49 Fed.Appx. 815, 2002 WL 31341552 (10th Cir.2002). On rehearing, however, the Court of Appeals reversed the court's ruling on the ineffective assistance of counsel claim as it relates to the jury selection issue. The case was remanded for this court "to conduct an inquiry into Defendant's ineffective assistance claim and [to] issue findings and conclusions as to the claim." *United States v. Orange,* Case No. 02–6112, Order at 4 (10th Cir. Apr. 17, 2003). Specifically, the Court instructed:

the district court's inquiry should proceed as follows. It should first determine whether [counsel's] failure to challenge the composition of Defendant's jury was a strategic decision, to which we give "considerable deference." If the district court finds that [counsel's] decision was not strategic, it should then investigate the merits of Defendant's jury composition claim to determine whether he can show deficient performance by his counsel and prejudice sufficient to establish an ineffective assistance claim. To that end, it should allow Defendant access to the Western District of Oklahoma's jury selection records, to which the Jury Selection and Service Act would have entitled him had a timely request been made.

*Id.* at 4–5 (citations and footnote omitted).

After appointing counsel for defendant, the court held evidentiary hearings on January 8 and February 25, 2004. At the conclusion of the February 25, 2004 hearing, the court continued the matter so that defendant could present evidence regarding the merits of his challenge to the jury selection process. The evidentiary hearing concluded on January 18, 2005.[1] This Memorandum Opinion constitutes the court's findings of fact and conclusions of law.[2]

Defendant was represented at trial and on appeal by appointed counsel, Stan Par-

---

1. The Honorable Wayne E. Alley presided over defendant's trial and the first two evidentiary hearings in this matter. On May 14, 2004, Judge Alley issued an Order governing the exchange of expert witness reports regarding the jury composition issue. In a subsequent Order, Judge Alley notified the parties that the evidentiary hearing would resume on August 20, 2004. On August 18, 2004, following an in-chambers conference with counsel, Judge Alley issued an Order striking the August 20, 2004 hearing. Due to Judge Alley's then-imminent retirement, the case was transferred the undersigned on August 23, 2004.

After a status conference with counsel, the court set the evidentiary hearing for December 2, 2004. On November 29, 2004, the hearing was continued at the request of the government to the week of January 17, 2005.

2. Although the undersigned did not preside over the evidentiary hearings held on January 8 and February 25, 2004, the court carefully reviewed the transcripts of those hearings together with all exhibits admitted into evidence and all documents touching on the merits of defendant's 2255 motion.

sons. Parsons testified that he and defendant met frequently before trial to discuss pretrial motions and trial strategy. Reporter's Transcript of Evidentiary Hearing Had on Thursday, January 8, 2004 at 14–15. Some months before trial, defendant specifically asked Parsons to pursue a jury composition challenge in his case. *Id.* at 15, 49. Parsons testified that he researched the issue by reviewing Tenth Circuit opinions and the plan used by this district to select jurors. *Id.* at 16–17. Based on that research, Parsons concluded that such a challenge was unlikely to succeed. Therefore, Parsons told defendant he was not going to file a motion challenging the jury selection process; defendant appeared to agree with that decision. *Id.* at 18. Defendant, however, remembers the conversation differently. Defendant testified that when, shortly before trial, he asked Parsons the status of the jury composition motion, Parsons responded that "he hadn't got around to it." *Id.* at 50. On the first day of trial, defendant again asked Parsons to object to the composition of the jury pool; Parsons responded that it was too late. *Id.* at 51.

It is undisputed that Parsons did not file a motion seeking access to the district's jury selection records and did not file a motion challenging the selection procedure. Parsons did, however, file a number of substantive pretrial motions, including: (1) a motion claiming spousal privilege to prevent co-conspirator Laura Banks from testifying; (2) a motion to suppress evidence seized at Banks' home; (3) a motion to suppress the testimony of all co-conspirators based on the panel's decision in *United States v. Singleton;*[3] (4) a motion

to sever defendant's trial from co-conspirator Victor Cooper; (5) a motion to dismiss the indictment due to preindictment delay; (6) a motion to dismiss certain counts of the indictment based on duplicity; (7) a motion to dismiss certain counts due to lack of jurisdiction; and (8) a motion to reveal the identity of a confidential informant. The court denied all of defendant's pretrial motions. :

■ To establish a claim of ineffective assistance of counsel, defendant must show that counsel's performance was deficient in that it "fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In applying this test, the court must "give considerable deference to an attorney's strategic decisions and 'recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Bullock v. Carver,* 297 F.3d 1036, 1044 (10th Cir.), *cert. denied,* 537 U.S. 1093, 123 S.Ct. 703, 154 L.Ed.2d 640 (2002) *(quoting Strickland,* 466 U.S. at 690, 104 S.Ct. 2052).

The proper measure of attorney performance is that of reasonably effective assistance under prevailing professional norms, considering all of the surrounding circumstances. The Court has been crystal clear that "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has

---

3. The panel's decision, which is reported at *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998), was subsequently vacated by the Court of Appeals *en banc. See United*

*States v. Singleton,* 165 F.3d 1297 (10th Cir.), *cert. denied,* 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999).

proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." For that reason, a reviewing court must "reconstruct the circumstances of counsel's challenged conduct [and] evaluate [that] conduct from counsel's perspective at the time." Because of the difficulties that inhere in such a process, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

*Bryan v. Mullin,* 335 F.3d 1207, 1217 (10th Cir.2003), *cert. denied,* 541 U.S. 975, 124 S.Ct. 1877, 158 L.Ed.2d 472 (2004) (*en banc*) (citations omitted). In addition to establishing that counsel's performance was deficient, defendant must also show that "the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The court need not address whether counsel's performance was deficient if defendant fails to prove actual prejudice. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. The Supreme Court, however, has recognized two types of errors that may occur during a criminal case. The first is error that occurs "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless

beyond a reasonable doubt." *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The second category of trial-level error is not subject to harmless error analysis because it presents "structural defects in the constitution of the trial mechanism". *Id.* at 309, 111 S.Ct. 1246. A structural error is one "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. 1246. The *Fulminante* Court recognized that "unlawful exclusion of members of the defendant's race from a grand jury" constitutes a structural error. *Id.* (*citing Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)).

In this case, an African–American defendant has challenged the composition of the pools from which his grand and petit juries were chosen on the ground that members of his race, and other minorities, were unlawfully excluded. This claim, if proven, would establish a structural error under *Vasquez* and *Fulminante.*[4] Thus, the court must examine the merits of defendant's jury composition claim to determine if he has established the prejudice component of his ineffective assistance claim.

■ Defendant asserts that the jury selection procedures used by this district violate the Fifth Amendment, the Sixth Amendment, and the Jury Service and Selection Act of 1968, 28 U.S.C. §§ 1861–1878.

The Sixth Amendment guarantees a defendant the right to a jury pool com-

---

4. The court rejects the government's prejudice analysis. The government argues that defendant cannot establish prejudice because there was overwhelming evidence of his guilt and therefore there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at

694, 104 S.Ct. 2052. This argument, however, misapprehends the nature of the error alleged in this case, which if true infects the entire process from the Grand Jury to the trial. Defendant's alleged prejudice is not that he was convicted, but that he was indicted and tried by juries that did not represent a fair cross section of the community.

prised of a fair cross-section of the community. A defendant does not, however, have a right to a jury of "any particular composition" and the jury actually chosen does not have to "mirror the community." Historically, federal courts have upheld the use of voter registration lists to select jury venires.

In order to establish a prima facie violation of the Sixth Amendment, Defendant must show: (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. In order to establish a Fifth Amendment equal protection violation, Defendant must show that the use of voter registration lists resulted in the "substantial underrepresentation" over a significant period of time of a "recognizable, distinct class." A selection process which is "susceptible of abuse or is not racially neutral" supports a presumption of discrimination. *United States v. Gault*, 141 F.3d 1399, 1402 (10th Cir.), *cert. denied*, 525 U.S. 910, 119 S.Ct. 253, 142 L.Ed.2d 208 (1998) (citations omitted). As the Jury Act codifies

defendant's Fifth [5] and Sixth Amendment [6] rights, defendant's statutory claim is evaluated under the standards enunciated for the constitutional claims. *United States v. Shinault*, 147 F.3d 1266, 1270 (10th Cir.), *cert. denied*, 525 U.S. 988, 119 S.Ct. 459, 142 L.Ed.2d 411 (1998). The government concedes that African–Americans, Indians, Asians, and Hispanics each constitute a distinct group in the community. Thus the court's analysis must focus on the second and third prongs of the prima facie case.

This district's jury selection plan was first adopted in 1968. As authorized by the Jury Selection and Service Act, the plan provides that the names of prospective jurors are selected at random from voter registration lists. The randomly selected names are then placed on a Master Jury Wheel. The plan also divides the 42 counties comprising the district into four nonstatutory divisions: the Oklahoma City, Guthrie, Chickasha, Pauls Valley and Shawnee division; the Enid and Ponca City division; the Lawton and Mangum division; and the Woodward division. Each division has its own Master Jury Wheel. A jury qualification questionnaire is mailed to one-quarter of the individuals listed in the Master Jury Wheel each year to create the qualified jury wheels.[7] Only prospective jurors who return the questionnaire and who are otherwise qualified

---

5. 28 U.S.C. § 1862 provides "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States ... on account of race, color, religion, sex, national origin, or economic status."

6. 28 U.S.C. § 1861 provides "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."

7. The plan in effect during the time at issue provided for an alphabetical listing of all the names from each Master Jury Wheel and plan specified that "[t]he operator shall mail juror qualification forms in the following manner:
    1997—Starting with # 1 and every fourth name thereafter.
    1998—Starting with # 2 and every fourth name thereafter.
    1999—Starting with # 3 and every fourth name thereafter.
    2000—Select the remaining names listed on the Master Jury Wheel."
   Defendant's Exhibit 11 at 4.

are included in the qualified jury wheels. Over the course of the four-year period of the 1997 jury wheel, 42,683 juror questionnaires were mailed in the Oklahoma City division.[8] Of these, 12,993 questionnaires were returned as undeliverable[9] and 6,301 questionnaires were never returned. Defendant's Exhibit 44 at 32.

In addition to returning the questionnaire, to be qualified to serve as a juror, a person must be a United States citizen, at least 18 years of age, and a resident of the district for at least one year. In addition, qualified jurors must be able to speak, read, write, and understand the English language, be physically and mentally fit to render jury service, and not have any felony charges pending or been convicted a felony. Trial jurors are selected from the qualified divisional jury wheel for the place where the trial is held. In the past decade, virtually all of the district's jury trials have been held at the United States Courthouse in Oklahoma City. Thus, the vast majority of trial jurors have been selected from the Oklahoma City divisional wheel.

In contrast, the district's plan provides for district-wide grand juries. The plan provides that "[g]rand jurors shall be drawn proportionately from each of the four qualified jury wheels as ordered by the Court . . . ." Defendant's Exhibit 10 at 238. On May 19, 1997, the Honorable David L. Russell issued an Order directing the Clerk to issue summons for 100 persons randomly selected from the four qualified jury wheels to appear for possible service as grand jurors. Defendant's Exhibit 12 at 3. The Order provided for the following percentage allocation between divisions: Oklahoma City—62 percent; Enid–Ponca City—13 percent; Lawton–Mangum—15 percent; and Woodward—10 percent. *Id.* This percentage allocation remains in effect today. *See id.* at 5.

Because defendant was indicted by the July 1997 grand jury, which was randomly drawn from the 1993 qualified jury wheels, and was tried by a petit jury drawn from the court's 1997 qualified jury wheel for the Oklahoma City division, the court must examine the racial makeup of the jury wheels for both time periods.

In determining whether a group has been underrepresented on jury venires, "courts generally rely on two methods of comparison: absolute disparity and comparative disparity." Absolute disparity measures the difference between the percentage of a group in the general population and its percentage in the qualified wheel. . . . Comparative disparity measures the *decreased likelihood* that members of an under-represented group will be called for jury service, in contrast to what their presence in the community suggest it should be. This figure is determined by dividing the absolute disparity of the group by that group's percentage in the general population.

8. The 1997 Oklahoma City Division Master Jury Wheel contained the names of 42,683 registered voters randomly selected from the voter registration lists for the counties within that division. Those counties are Blaine, Canadian, Cleveland, Garvin, Grady, Kingfisher, Lincoln, Logan, McClain, Oklahoma, and Pottawatomie Counties.

9. Robert Dennis, Clerk of the Western District of Oklahoma, testified that if an undeliverable questionnaire is returned with a forwarding address, the questionnaire is re-mailed. No effort, however, is taken to locate valid addresses for other undeliverable questionnaires. Dennis indicated that the highest percentage of undeliverable questionnaires occurs during the fourth year of a jury wheel cycle.

*Shinault,* 147 F.3d at 1272 (citations omitted) (emphasis in original). In making this determination, the court compares the percentage of minorities in the qualified wheels versus the racial and ethnic composition of the general population over the age of 18 as determined by Census data.[10] *See United States v. Yazzie,* 660 F.2d 422, 427 (10th Cir.1981). In this case, the relevant numbers for the 1993 district-wide qualified jury wheel, over its four-year life, are:

| Distinctive Group | Black | Indian | Asian | Hispanic |
|---|---|---|---|---|
| Percentage of voting age population (1990 Census) | 7.40 | 4.21 | 1.47 | 3.02 |
| Percentage of qualified venire | 4.78 | 2.66 | 0.67 | 1.36 |
| Absolute disparity | 2.62 | 1.55 | 0.80 | 1.66 |
| Comparative disparity | 35.41 | 36.82 | 54.41 | 54.97 |

Because grand jurors are chosen district-wide, the court rejects defendant's piece-meal analysis which individually examines the racial composition of each the four divisions comprising the district. *See* Defendant's Proposed Findings of Fact and Conclusions of Law at 17–26. For purposes of analysis, the court thus uses the district-wide race and ethnicity percentages calculated by the government's expert. *See* Government's Exhibit 44A at Table 2. The court notes that defendant accepts the government's figures for 1997[11] and provides no principled basis for rejecting the 1993 data.[12]

The comparable figures for prospective jurors in the 1997 qualified jury wheel for the Oklahoma City division, measured over the four-year life of that wheel, are:

| Distinctive Group | Black | Indian | Asian | Hispanic |
|---|---|---|---|---|
| Percentage of voting age population (1990 Census)[13] | 8.63 | 4.27 | 1.64 | 2.74 |
| Percentage of qualified venire | 5.06 | 2.64 | 0.80 | 1.49 |
| Absolute disparity | 3.57 | 1.63 | 0.84 | 1.25 |
| Comparative disparity | 41.37 | 38.17 | 51.22 | 45.62 |

The starting point for the court's analysis is absolute disparity. *See Shinault,* 147 F.3d at 1273. The greatest absolute disparity in this case—with respect to African–Americans on the 1997 Oklahoma City divisional wheel—is less than 4 percent. Absolute disparities of much greater magnitudes are required to establish a constitutional violation. *See Duren v. Missouri,* 439 U.S. 357, 365–66, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (39 percent absolute disparity); *Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272,

---

10. The court acknowledges the imprecise nature of this comparison as the general population contains persons who are not eligible to serve on juries. Nonetheless, as noted in *Shinault,* no reliable measurement of the eligible general population exists. *Shinault,* 147 F.3d at 1272.

11. *See* Defendant's Proposed Findings of Fact and Conclusions of Law at 13–14.

12. Moreover, there are only slight differences between the racial and ethnic percentages calculated by defendant's expert and those used by the court. *See* Defendant's Exhibit 9 at 26 (Table 1993.3e) (Black: 4.55%; Asian: 0.6%; Indian: 2.49%); Defendant's Exhibit 44 at 16 (Table 1993.6e) (Hispanic: 1.30%).

13. Defendant argues that "due to demographic shifts over time, the 1990 Census figures tend to understate the black population actually living within the division as of 1997." Defendant's Proposed Findings of Fact and Conclusions of Law at 14. He urges the court to calculate the division's racial make-up using 1997 Census population estimates. *Id.* The court declines to do so for two reasons. First, defendant did not provide the court with the 1997 Census estimates; thus, the court could not determine the accuracy of the figures presented by defendant. Second, as noted by the Court in *Yazzie,* "demographic data change constantly, and some points must be chosen at which to compile, and to apply them: All data are no sooner taken than they begin to be outdated." *Yazzie,* 660 F.2d at 428. The court thus relies on the office decennial Census data.

51 L.Ed.2d 498 (1977) (40 percent); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (18 percent).

Defendant correctly notes that, given the relatively small size of the minority populations at issue, even a total exclusion of the largest minority group would result in an absolute disparity of only 7.40 to 8.63 percent. He claims that the comparative disparity figures demonstrate the significant underrepresentation of minorities in the qualified jury wheels. The comparative disparity figures, however, suffer from the same infirmity as "they too are distorted by the small population of the different minority groups." *Shinault,* 147 F.3d at 1273. In *Shinault,* the Court found that a comparative disparity as high as 59.84 percent failed to establish a prima facie violation given the small size of the minority population in relation to the population as a whole. *Id.* Likewise, in this case, the comparative disparity figures "do not demonstrate the type of 'marked' or 'gross' disparities that we have found necessary to establish that the representation of a group is not fair and reasonable in relation to their number in the community." *Id.* For both the 1993 district-wide wheel and the 1997 Oklahoma City division wheel, the highest comparative disparity is for Asians, who account for less than two percent of the relevant population.

Defendant's argument that standard deviation analysis "confirms that these underrepresentations of minorities were not caused by chance variations in the selection process"[14] is unavailing. Such analysis merely manipulates the data the court has already found to be insufficient to establish a Sixth Amendment violation. *See United States v. Chanthadara,* 230 F.3d 1237, 1257 (10th Cir.2000), *cert. denied* 534 U.S. 992, 122 S.Ct. 457, 151 L.Ed.2d 376 (2001).[15]

■ Likewise, the data fail to demonstrate that use of voter registration lists results in a "substantial underrepresentation" of distinct minority groups. Nor has defendant demonstrated that there is anything in the district's selection process that is "susceptible of abuse" or "not racially neutral". Nonetheless, defendant argues that the district systematically excludes a disproportionate number of prospective African–American jurors because it fails to update addresses and to follow-up on delivered but unreturned questionnaires. There is no evidence, however, that the undeliverability of questionnaires due to incorrect addresses had a greater impact on minorities than on whites.[16] Likewise, defendant's assertion that African–Americans are more likely not to return questionnaires does not demonstrate a systematic flaw in the district's jury selection system. There is nothing in the *system* that discourages or prevents African–Americans from returning the questionnaires. *See United States v. Weaver,* 267 F.3d 231, 244 (3d Cir.2001), *cert. denied,* 534 U.S. 1152, 122 S.Ct. 1118, 151 L.Ed.2d

**14.** Defendant's Proposed Findings of Fact and Conclusions of Law at 16.

**15.** The government insists that Court of Appeals for the Tenth Circuit rejected use of standard deviation analysis in *Chanthadara. Chanthadara* contains no such categorical holding. While the Court found that standard deviation analysis was not "helpful in this case", it did not indicate that such analysis

could never be used. *Chanthadara,* 230 F.3d at 1257. *See also Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. 1272.

**16.** Defendant presented evidence that updating address lists for the jury wheels could be accomplished at a *de minimus* cost. Declaration of Gerald W. Dower.

1011 (2002). While follow-up letters or summonses might increase the return rate, there is no indication that such action would result in a higher return rate only for African–Americans. Indeed, any action that would be targeted solely at one race would be suspect as it would not be racially neutral. Furthermore, there is no indication that defendant's proposed solution—use of driver's license data as opposed to voter registration lists—would cure these problems. The court finds that defendant has failed to establish a Fifth Amendment equal protection violation.

■ To the extent defendant's statutory claims mirror his Fifth and Sixth Amendment claims, they are likewise unavailing. Defendant also, however, asserts that the district's grand jury selection procedure violates the Act's proportionality requirement. Section 1863(b)(3) requires that the district's plan ensure "each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions." 28 U.S.C. § 1863(b)(3). Defendant argues that the district's method of selecting prospective grand jurors results in disproportionate representation of the two divisions with the lowest African–American populations, Woodward and Enid–Ponca City. While the numbers reflect a minor geographic imbalance, they do not support defendant's premise that a substantial violation of the Act occurred. Analysis of the data reflects

that of the 100 potential grand jurors, only 4 were misplaced among divisions. Pursuant to the May 19, 1997 Order, prospective grand jurors were chosen in the following proportion:

| | |
|---|---|
| Oklahoma City Division | 62 |
| Enid–Ponca City Division | 13 |
| Lawton–Mangum Division | 15 |
| Woodward Division | 10. |

According to defendant, if proportionality were measured on the basis of registered voters after the 1996 general election,[17] the proportional allocation between the divisions should have been:

| | |
|---|---|
| Oklahoma City Division | 66 |
| Enid–Ponca City Division | 12 |
| Lawton–Mangum Division | 15 |
| Woodward Division | 7. |

This results in three extra jurors from the Woodward division and one from Enid–Ponca City. While both of these divisions have a lower African–American population than two urban divisions, they also have the lowest absolute disparities for African–Americans.[18] Not "every error or deviation in calculating proportionality constitutes 'a substantial failure to comply' with the provisions of the Act." *United States v. Bailey,* 76 F.3d 320, 322 (10th Cir.), *cert. denied,* 517 U.S. 1239, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996). The court finds that the minor geographic imbalance reflected here is not of sufficient magnitude to constitute a violation of the Act.

Having analyzed the merits of defendant's jury composition claim, the court finds that defendant cannot establish the

---

17. The district's plan does not specify whether registered voters or actual voters will be used to measure proportionality. Given that the Master Jury Wheel is constructed from the names of registered voters, the court finds that proportionality should be measured using registered voters.

18. According to defendant's data, the absolute disparities for African–Americans in the four divisions over the life of the 1993 qualified wheels was: Oklahoma City—3.49 percent; Lawton–Mangum—4.6 percent; Enid–Ponca City—1.6 percent; and Woodward—0.6 percent. *See* Defendant's Exhibit 44 at 17–20.

prejudice prong of his ineffective assistance claim. In light of that ruling, the court need not determine whether counsel's performance was deficient. The court notes, however, that resolution of this claim required more than nine hours of evidentiary hearings, hundreds of pages of exhibits, expert witness reports, and countless hours of attorney time. Given the state of the law in 1998,[19] counsel correctly determined that a challenge based on jury composition had very little chance of success. Furthermore, mounting such a challenge would have required expending valuable time to conduct a detailed investigation and thus would have required counsel to ignore the other matters on which he sought relief for defendant. Counsel testified that he made strategic decision not to challenge this district's jury selection procedure. Reporter's Transcript of Evidentiary Hearing Had on Thursday, January 8, 2004 at 17–18, 32. This court cannot say that that decision constitutes deficient performance.

In sum, Defendant's Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. No. 294) is DENIED. Judgment will issue accordingly.

It is so ordered this 22nd day of February, 2005.

---

**19.** As noted by the court in its initial Order denying defendant's motion to vacate, "[t]he method used in this district has been repeatedly upheld by the court of appeals. *See United States v. Shinault,* 147 F.3d 1266 (10th Cir.1998) (Kansas); *United States v. Gault,* 141 F.3d 1399 (10th Cir.1998) (New Mexico); *United States v. Afflerbach,* 754 F.2d 866 (10th Cir.1985) (Wyoming)." *United States v. Orange,* Case No. CR–98–44–L, Order at 4 (W.D.Okla. Mar. 28, 2002) (Alley, J.).