**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**April 22, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRUCE HOLDER,

    Defendant - Appellant.

No. 23-1021

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CR-381-CMA-GPG-1)**
_____

Ann Marie Taliaferro, Brown Bradshaw & Moffat, Salt Lake City, Utah (Benjamin Miller, Salt Lake City, Utah, with her on the briefs) for Defendant-Appellant.

Kyle Brenton, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with him on the brief) United States Attorney's Office, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, **BALDOCK**, and **EID**, Circuit Judges.
_____

**TYMKOVICH**, Circuit Judge.
_____

Bruce Holder ran a fentanyl distribution ring that distributed thousands of pills in western Colorado. He was tried and convicted of four federal drug crimes, including two predicated on the death and serious injury of buyers of his product.

Holder alleges that his trial was unconstitutional because the district court's COVID-19 protocols violated his public trial right. He also contends Colorado's jury pool unreasonably underrepresents members of certain racial groups. Finally, he argues that several counts were constructively amended at trial, and the evidence could not support the jury's finding that his fentanyl distribution resulted in a victim's death.

We **AFFIRM**. The district court's restrictions were no more restrictive than necessary to protect public health against the perceived harms from COVID-19. Nor did an unreasonable racial disparity exist in the members of the jury pool. The indictment was not constructively amended as no essential elements were altered. Finally, the jury reasonably found that Holder's fentanyl distribution resulted in a victim's death.

## I.     Background

### A.     *The Underlying Facts*

#### 1.     *The Conspiracy*

Holder was accused of managing a network of friends and family to distribute fentanyl. He would instruct his friends and family to drive from Grand Junction, Colorado to Sonora, Mexico. While they vacationed in Puerto Peñasco, their cars would be stocked with fentanyl. Each time, more than 2,000 pills would be stashed in hidden compartments in the cars. By the summer of 2017, Holder's wife, Marie Matos, was making the trip to Mexico every two weeks, bringing back more than 50,000 pills.

The pills they brought back were counterfeits that looked like regular oxycodone.  They were small, circular, blue, and were stamped with a capital M inside a box on one side and the number thirty on the other.  They were made to appear exactly like oxycodone manufactured by Mallinckrodt Pharmaceuticals—the "box M" is Mallinckrodt's trademark.  Holder knew that these were counterfeit pills that contained fentanyl.

Holder's friends and family would distribute the pills.  Holder's circle included his wife, son, daughter, stepdaughter, and several close friends.  All of whom testified that Holder was the ringleader of the conspiracy controlling the supply and prices.

### 2.     The Overdoses

Zack Green both used and sold Holder's pills.  Green bought pills either from Holder directly or through Holder's distributor, Christopher Huggett.  Holder and Huggett were Green's only source of pills, and Green knew of no other source for blue fentanyl pills in the area.

Green often sold the pills he bought to his coworker, Jon Ellington.  On December 26, 2017, Ellington gave Green cash for ten pills.  Green then bought twelve pills from Huggett who bought them from Holder.  He kept two for himself and delivered the rest to Ellington.  Two days later, Green smoked one of those blue pills in his car at work.  He took two hits, put the car in drive, and passed out.  The assistant manager found Green unconscious when his vehicle hit the building.  She

3

pulled Green from the car and called 911.  The paramedics administered Narcan and took Green to the hospital.  Green was discharged a few hours later.

On the same day as Green's episode, Ellington's housemate found him overdosed in his room.  Ellington had not shown up for work for two days, and, after receiving a call from Ellington's employer, his housemate found him slumped over in a chair in his room.  Paramedics administered Narcan but could not revive him.

Ellington had a syringe in his lap and a tourniquet on the floor between his legs.  On his dresser, his housemates found a spoon and cotton ball with blue residue on them.  They also found several pill bottles in that dresser.  One bottle contained a pill that was the same color blue as the residue.  The rough markings the housemates described were later identified as the "box M" consistent with Holder's fentanyl pills.  Other substances were also found in Ellington's room.  Law enforcement found one irregular pill identified as MDMA, a stimulant and psychedelic drug also known as ecstasy, and a tan substance identified as DMT, a powerful psychedelic drug.

The toxicology reports pointed to fentanyl as the cause of death.  Ellington's blood tests found a fentanyl concentration of 18 nanograms per milliliter—between six and nine times higher than expected from a typical prescription fentanyl patch.  Two coroners concluded that this concentration was the but-for cause of Ellington's death.  Although the defense's expert forensic pathologist recognized fentanyl intoxication as "a correct cause of death," she refused to conclude it with certainty because testing was limited.  R., Vol. VIII at 1273.  She pointed out that the basic toxicology test did not examine Ellington's urine and did not test for DMT even

4

though the substance was found in his room.  The only substance other than fentanyl the basic test detected was THC.

### B.    Holder's Prosecution

#### 1.    The Indictment

The second superseding indictment charged six defendants with a total of sixteen counts.  Holder went to trial on four counts: (1) conspiracy to distribute 400 grams or more of counterfeit fentanyl, (2) distribution of fentanyl resulting in the death of Ellington, (3) distribution of fentanyl resulting in serious bodily injury to Green, and (4) distribution of a counterfeit controlled substance.  *See* 21 U.S.C. § 841(a)–(b).

#### 2.    The Jury Venire

The District of Colorado's Jury Plan provides that the Master Jury Wheel will come from a source list made up of the Colorado General Election Voter Registration List supplemented by the list of licensed drivers and state-issued adult identification cards.  From this "master wheel" jurors are randomly selected for a given grand or petit jury.

When the court imports names from the voter registration list, it only imports voters that are marked "active."  A voter is marked "inactive" if mail sent to that voter by the county clerk is returned.  When the jury wheel for this trial was last refilled, inactive voters made up 13.94% of all registered voters.  R., Vol. II at 961.

### 3.     The Trial

Holder was indicted by a Grand Jury in Grand Junction, Colorado, and was set to be tried there. But Holder's trial began on March 13, 2020, the same day President Trump declared a national emergency due to COVID-19. Not enough potential jurors showed up to empanel a jury that day. The court and parties worked for over a year to set and reset trial dates while navigating changing pandemic protocols.

Eventually, the trial was moved to Denver because the district court determined the Grand Junction courthouse was too small to accommodate a socially distanced jury. The trial finally took place in April 2021, the first pandemic trial in the district. To limit the risk to participants, the Chief Judge of the District of Colorado promulgated a number of protocols governing the trial. Holder was also given the choice between pushing back his trial date or proceeding under the protocols. He chose to go to trial.

The jury sat six feet apart in the gallery, while witnesses testified from the jury box. All attendees wore masks. Spectators were also limited. The Arraj Courthouse, where the trial took place, was closed to the public, so spectators had to receive permission from the court to attend. The only spectators who attended the trial were two members of Ellington's family. Both parties were provided a dial-in number that they could disseminate to those who wanted to listen to the proceedings.

Holder filed written objections to the COVID protocols before trial, focused only on the protocols around witness testimony. He requested that witnesses be able to testify from behind a plexiglass screen in the jury box—without a mask.

6

R., Vol. II at 301–06. The district court denied these requests. Holder did not challenge the access protocols in that motion.

He did not object to those protocols until day five of his eight-day trial. Counsel objected to the lack of video access, claiming the public could not view and thus could not assess the exhibits, and that the call-in number had not been made publicly available. The courtroom deputy did not know whether the number was on the court's website but did confirm that the number was provided to both parties and they were free to disseminate the number to outsiders. The court simply noted Holder's objections.

The jury convicted Holder on all four counts.

## II.    Analysis

Holder challenges the COVID protocols, the racial composition of the jury pool, and several legal rulings by the district court. We address each in turn.

### A.    *Public Trial*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI. We review de novo whether Holder's constitutional rights were violated. *United States v. Addison*, 708 F.3d 1181, 1186 (10th Cir. 2013).

#### 1.    *Waiver*

The district court found that Holder waived his public-trial objection, and the government argues we should do the same. We agree only in part.

In his pretrial written objections to the COVID protocols, Holder did not object to public access to the courthouse or the call-in number. He renewed his written objections on day one of the trial and again failed to object on public-trial grounds. He did not object to the closed courtroom until his trial was half over.

By the time he objected, the courtroom was at least partially open. Days one and two of the trial were closed to the public because the entire gallery was needed for prospective jurors. Ellington's family could not have attended until day three after opening statements and voir dire had already occurred. Holder argues that because these critical stages of the trial took place behind closed doors, his public trial rights were violated.

To the extent that Holder challenges the lack of public visual access, that argument is forfeited. He failed to raise the argument before the district court and does not argue plain error here—that is the "end of the road" for his argument. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011). Holder knew before the trial that there would be no in-person or video access. He was given the choice of going to trial under the district's COVID protocols or waiting until regular trials could resume. He chose the COVID trial and did not object to the lack of visual access before the trial began.

Even if we credit Holder's day-five objection, he cannot show a constitutional violation.

### 2. *Total or Partial Closure*

The right to a public trial is deeply rooted in the Anglo-American legal tradition. *See* Richard W. Garnett, *Public Trial*, *in* THE HERITAGE GUIDE TO THE CONSTITUTION 444, 446 (David F. Forte & Matthew Spalding eds., 2d ed. 2014) ("There was widespread agreement with Sir Edward Coke's view, expressed in 1607, that a trial is almost by definition open and public."). "[T]he Sixth Amendment 'does but follow out the established course of the common law in all trials for crimes. *The trial is always public*.'" Akhil Reed Amar, *Sixth Amendment First Principles*, 84 GEO. L.J. 641, 678 (1996) (emphasis in original) (quoting 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1785, at 662 (1833)).

Even so, the right to a public trial is "not absolute." *Addison*, 708 F.3d at 1187 (citing *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). The public access right has been assessed by courts in situations involving both total and partial closures.

A total closure occurs when the court excludes "all persons other than witnesses, court personnel, the parties, and the lawyers." *Waller*, 467 U.S. at 42. In *Waller*, the Supreme Court ruled that a total closure to a suppression hearing violated the defendant's Sixth Amendment right. The point of the public trial right, the Court stated, is "that the public may see [the accused] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* at 46 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)).

9

To that end, total closures "must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* at 48. Any closure short of total is partial. *See Nieto v. Sullivan*, 879 F.2d 743, 753 (10th Cir. 1989) (finding a partial closure where only the defendant's relatives were excluded). When a closure is only partial, the defendant's public trial right "gives way" so long as there is a "substantial reason" for the public restrictions. *Addison*, 708 F.3d at 1187 (internal quotations omitted).

We recently examined a COVID courtroom closure protocol and ratified a total closure during the pandemic. In *United States v. Veneno*, 107 F.4th 1103, 1112 n.1 (10th Cir. 2024), we considered whether an audio and video feed of an otherwise closed courtroom was a total or partial closure. No matter how the closure was framed, we ruled that it was justified. *Id.* at 1112. We noted that the district court, the parties, and the Supreme Court all accepted the COVID pandemic as an overriding interest. *Id.* at 1113 n.2 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam)). We explained that given the overriding interest in protecting public health, the district court's decision to close the courtroom to the public and seat the jury in the gallery was "eminently reasonable." *Id.* at 1114. In short, "the district court properly analyzed the closure, correctly found an overriding interest justifying closure, appropriately determined the closure was no broader than necessary, and reasonably concluded no reasonable alternatives existed." *Id*. at 1114. The defendant argued that the district court could

have saved room for the public, the press, or his family, but we ruled that "[a]lthough the district court could possibly have made room for a few members of the public, doing so was not necessarily reasonable at the height of the pandemic." *Id.* Even the dissent agreed "[t]here is no question the pandemic qualified as an overriding interest justifying closure." *Veneno*, 107 F.4th at 1120 (Rossman, J., dissenting in part; arguing that the court should have allowed video access during voir dire).

Those justifications apply here. *First*, the closure (after jury selection and opening) in this case is only partial. As we explained, a total closure occurs only when the court "excludes all persons besides 'witnesses, court personnel, the parties, and the lawyers.'" *Veneno*, 107 F.4th at 1112 (quoting *Waller*, 467 U.S. at 42). Even a few attendees other than the parties creates a closure that is only partial. By way of contrast, in *Presley v. Georgia*, the trial court excluded the lone observer from voir dire and the Supreme Court treated that case as a total closure. *Presley v. Georgia*, 558 U.S. 209, 213–14 (2010). If excluding the lone observer creates a total closure, then it follows that allowing even a lone observer may render a closure partial. *See United States v. Allen*, 34 F.4th 789, 798 (9th Cir. 2022) (requiring "some form of visual access" including "only a small number of public attendees").

Here, at least some of the public was present. After jury selection, when more space in the courtroom was available, the government requested that the victim's mother and her coworker be permitted to attend the trial. The court granted that request and Holder did not object nor did he request his own guests. R., Vol. II at 886 n.8.

11

Our circuit precedent is clear that total closures occur only when the court is closed to "*all persons* besides witnesses, court personnel, the parties, and the lawyers." *Veneno*, 107 F.4th at 1112 (emphasis added). Because the victim's mother and her coworker were present, the courtroom was not totally closed for the relevant portion of the trial.[1]

*Second*, COVID is a substantial reason that justifies the partial closure. *See id.* at 1113 n.2; *see also Diocese of Brooklyn*, 592 U.S. at 18 ("Stemming the spread of COVID–19 is unquestionably a compelling interest"). The district court followed the Chief Judge of the District of Colorado's protocols for holding a COVID trial and these protocols were careful enough to protect Holder's public trial rights, as well as the health of the public.

Holder's primary argument is that whether the closure is total or partial, the lack of visual access to the public is unreasonable. He leans on *United States v. Allen* in which the Ninth Circuit held that a district court order allowing no spectators and no video stream was "truly exceptional." 34 F.4th at 798. The Ninth Circuit ruled that because other courts had allowed limited spectators or a video feed, the court had less restrictive means than a total closure of the courtroom. Holder argues that we should follow the Ninth Circuit's lead.

But *Allen* itself approves of the access protocols in Holder's trial. When the *Allen* court lists other district courts who allowed at least some visual access, it cites

---

[1] We need not and do not decide whether audio-only access results in a total or partial closure.

the district court order *in this case*. *See Allen*, 34 F.4th at 798 n.5, 799 (twice citing the district court's order denying a new trial). Rather than make Holder's case, *Allen* bolsters our conclusion that this is a partial closure and that an audio line with limited spectators satisfies the Sixth Amendment.

Holder's final argument is that even if audio-only access is constitutional, it is insufficient here because the court did not advertise the dial-in number. But nothing requires a court to advertise the date, time, and location of a trial. The district court provided the dial-in number to the parties to disseminate, and counsel confirmed at oral argument that the number was available if the public called the clerk's office.[2] The relevant question is who was excluded from the trial. *See Nieto*, 879 F.2d at 753 (finding that excluding the defendant's family during certain testimony amounted to a partial closure). Here, the public was not excluded from audio access.

The restrictions here, when paired with a public dial-in number, are justified by the substantial interest in protecting the health of the trial's participants. Holder's public trial right was not violated.

### B.    *Impartial Jury*

The Sixth Amendment also guarantees Holder a trial by an impartial jury. U.S. CONST. amend. VI. A court violates the defendant's Sixth Amendment rights if it does not "draw its jury members from a fair cross section of the community."

---

[2] The protocols were available to the public: "An audio link will be provided [for all trials] to allow members of the public to call in and listen to the proceedings." R., Vol. II at 312.

*United States v. Shinault*, 147 F.3d 1266, 1270 (10th Cir. 1998).  Holder challenges

the district court's exclusion of inactive voters from the jury wheel, claiming that this

systematically excludes black and Hispanic voters.

We review the district court's findings of fact for clear error and the ultimate

legal determination de novo.  *Id.* at 1271.  Holder challenges the jury wheel both

under the Sixth Amendment and the Jury Selection and Service Act of 1968 (JSSA),

which prescribes procedures for jury selection and ensures no juror is excluded for

invidious reasons.  *See* 28 U.S.C. § 1861 *et seq*.

We review Holder's claims under the standards set forth by the Supreme Court

in *Duren v. Missouri*.  439 U.S. 357, 364 (1979).  The standard for assessing fair-

cross-section-claims is the same under the Sixth Amendment and the JSSA.  *See*

*United States v. Test*, 550 F.2d 577, 585 (10th Cir. 1976).  To establish a prima facie

case, Holder must show

> (1) that the group alleged to be excluded is a "distinctive"
> group in the community; (2) that the representation of this
> group in venires from which juries are selected is not fair
> and reasonable in relation to the number of such persons in
> the community; and (3) that this underrepresentation is due
> to systematic exclusion of the group in the jury-selection
> process.

*Duren*, 439 U.S. at 364.  Holder cannot show unreasonable underrepresentation or

systematic exclusion.

The parties agree that black and Hispanic jurors are distinctive groups in the

community, so we begin at *Duren* prong two.  To determine whether a group is

underrepresented, we use two comparative methods: absolute disparity and

14

comparative disparity. *Shinault*, 147 F.3d at 1272. Holder argues that both methods show unreasonable underrepresentation.

*Absolute disparity* measures the difference between the group's percentage of the population and the group's representation in the qualified wheel. *Id.*; *see also* Opening Br. at 71–72 ("For example, if Black people compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%."). There is no set threshold to determine a non-representative jury list, but "[c]ourts generally are reluctant to find that the second element of a prima facie Sixth Amendment case has been satisfied when the absolute disparities are less than 10%." *Shinault*, 147 F.3d at 1273. Most recently, we held that an absolute disparity of 3.57% fell short of a prima facia violation. *United States v. Orange*, 447 F.3d 792, 798 (10th Cir. 2006).

With this in mind, the absolute disparities in this case are reasonable. The defense expert in this case found the absolute disparities were 1.41% for black voters and 2.63% for Hispanic voters. Opening Br. App. C at ¶¶ 54–55. The government's expert numbers were lower: a 0.22% difference for black voters and 0.81% for Hispanic voters. R. Vol. III at 883. No matter which numbers this court uses, both are well below any percentages the Supreme Court or this court have found to violate the Sixth Amendment. *Compare Duren*, 439 U.S. at 365–66 (rejecting 39% absolute disparity) *with United States v. Yazzie*, 660 F.2d 422, 427 (10th Cir. 1981) (allowing 4%) *and United States v. Gault*, 141 F.3d 1399, 1402–03 (10th Cir. 1998) (allowing 7%).

The *comparative disparities* in this case are no more alarming. Comparative disparity is determined by taking the absolute disparity of a group and dividing it by the percentage of the population that group occupies. *See Gault*, 141 F.3d at 1402. Comparative disparity measures the percentage of that group "missing" from the jury venire. It is a helpful measure for groups who make up a low percentage of the population and thereby cannot have a high absolute disparity. The defense expert found that comparative disparity for black voters was 34.42% and was 16.82% for Hispanic voters. These numbers too are well below the comparative disparities this court has approved. *See, e.g.*, *Shinault*, 147 F.3d at 1273 (allowing comparative disparities of 59.84%, 50.09%, and 48.63%), and *United States v. Chanthadara*, 230 F.3d 1237, 1257 (10th Cir. 2000) (same with 58.39% and 40.89%).

We have long recognized that "only 'gross' or 'marked' disparities or 'substantial' departures from a 'fair cross section' of the community require judicial intervention." *Test*, 550 F.2d at 590. It is clear from our precedent that any underrepresentation in this case is nowhere near "gross," "marked," or "substantial." Holder has not shown unreasonable underrepresentation.

And so, his claim fails there. But even if we went further, Holder cannot show systematic exclusion. His only argument is that the numbers are self-evidently not the result of random factors, chance, or luck. He supports this theory with his expert's assertion that the percentage of persons on the qualified jury wheel differs from the general population by seven standard deviations. But this does not show

systematic exclusion, especially when the disparity numbers do not show an extreme departure.

Holder has failed to make a prima facia showing that his jury was not made up of a representative cross section of his community. He cannot show unreasonable underrepresentation of black or Hispanic voters and cannot show that any underrepresentation is due to systematic exclusion.

### C.    *Constructive Amendment of the Indictment*

Next, Holder argues that the district court constructively amended the first and third counts of his indictment in violation of his Fifth Amendment rights. He points to three instances he believes amended the indictment. First, he claims the jury instructions allowed the jury to convict him for a different conspiracy, not just the six-person conspiracy described in the indictment. Second, he claims the jury was instructed it could find the pills were *either* fentanyl *or* counterfeit, but the indictment alleged *both*. Finally, he claims the jury found him guilty of distribution of fentanyl resulting in bodily harm despite making the special finding that no bodily harm occurred.

At trial, Holder did not object on any of these grounds, so we review for plain error. He must demonstrate (1) an error, (2) that is plain, (3) that affects his substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Miller*, 891 F.3d 1220, 1231 (10th Cir. 2018). Holder cannot show that the district court plainly erred and allowed constructive amendment of the indictment.

The Fifth Amendment to the Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. CONST. amend. V. To protect this right, courts must ensure that a defendant "only be tried on charges for which a grand jury has indicted him." *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988). "[C]onstructive amendment occurs when the indictment alleges a violation of the law based on a specific set of facts, but the evidence and instructions [at trial] then suggest that the jury may find the defendant guilty based on a different, even if related, set of facts." *Miller*, 891 F.3d at 1234.

*Count One*. Holder first argues that Count One of the indictment was constructively amended. Count One reads:

> Count One: BRUCE HOLDER, LEXUS HOLDER, CORINA HOLDER, GERI BOCHMANN, JESSICA BRADY, and MARIE MATOS, did knowingly and intentionally conspire with each other and with persons known and unknown to the Grand Jury to distribute and possess with intent to distribute 400 grams and more of a mixture or substance containing a detectable amount of fentanyl, . . . and such substance, without authorization, bore an identifying mark that falsely purported the substance to be the product of Mallinckrodt, Inc..

R., Vol. VIII at 340. Holder's theory is that the count alleges a *single conspiracy* of at least the six people named. But, he claims, the jury instructions and prosecutor's arguments invited the jury to convict him for *any conspiracy* it could find.

We have held that, when considering constructive amendment claims, "the jury instructions are of particular importance because they provide assurance that the jury found the conduct charged in the indictment before it could convict." *United States v.*

18

*Porter*, 928 F.3d 947, 960 (10th Cir. 2019) (internal quotations and alterations removed).

Indeed, Holder starts with the jury instructions.  He claims that Instruction 19 broadened

the indictment because it stated that the jury must find beyond a reasonable doubt that

"*two or more persons* agreed to violate the federal drug laws."  R., Vol. II at 692

(emphasis added).[3]

---

[3] Instruction 19 reads:

> BRUCE HOLDER, LEXUS HOLDER, CORINA HOLDER, GERI BOCHMANN, JESSICA BRADY, and MARIE MATOS, did knowingly and intentionally conspire with each other and with persons known and unknown to the Grand Jury to distribute or possess with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 (a)(1) and (b)(1)(A)(vi), and such substance, without authorization, bore an identifying mark that falsely purported the substance to be the product of Mallinckrodt, Inc., a manufacturer of controlled substances, which did not, in fact, manufacture such substance[.]
>
> &#42; &#42; &#42;
>
> To find Mr. Holder guilty of this crime you must be convinced that the Government has proved each of the following beyond a reasonable doubt:
>
> First: *two or more persons* agreed to violate the federal drug laws by:
> (1) distributing or possessing with intent to distribute fentanyl, or
> (2) distributing or possessing with intent to distribute a counterfeit substance;

R., Vol. II at 692 (emphasis added).

We disagree.  The jury instructions, as a whole, do not broaden the indictment, and remain focused on the six-person conspiracy.  Instruction 19 begins with a verbatim restatement of the count.  The jury was reminded of the six-person count at the very outset of the instruction.  The language that Holder objects to is simply a description of the elements of a conspiracy pertaining to controlled substances.  In fact, that sentence is taken directly from the Tenth Circuit's pattern jury instructions.  *See* Tenth Cir. Pattern Crim. Jury Instr. § 2.87.

Second, Holder elides Instruction 21, which he requested.  Instruction 21's entire purpose is to ensure that the jury only convicts for the charged conspiracy.  It reminds the jurors "Count 1 of the indictment charges that the defendant was a member of one single conspiracy"; "[p]roof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment"; and "[i]f you find that the defendant was not a member of the conspiracy charged, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy."  R., Vol. II at 695.[4]

---

[4] Instruction 21 provides:

> Count 1 of the indictment charges that the defendant was a member of one single conspiracy to commit the crime of distributing and possessing with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance, and such substance, without authorization, bore an identifying mark that falsely purported the substance to be the product of Mallinckrodt, Inc.

20

As a whole, the jury instructions point the jury to the charged conspiracy. The district court did not err, let alone plainly err, in allowing the instructions.

Still, Holder argues, Count One was constructively amended to allow the jury to find he conspired to distribute a counterfeit substance *or* fentanyl when the indictment alleges he distributed *both*. He is correct that the indictment charges him in the conjunctive, but the jury instructions explain the charge in the disjunctive.

The indictment read:

> BRUCE HOLDER, LEXUS HOLDER, CORINA HOLDER, GERI BOCHMANN, JESSICA BRADY, and MARIE

---

The defendant has argued that there were really two or more separate conspiracies, instead of the single conspiracy charged in the indictment.

You must determine whether the single conspiracy, as charged in the indictment, existed, and if it did, whether the defendant was a member of it.

Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment, unless one of the several conspiracies which is proved is the single conspiracy charged in the indictment.

If you find that the defendant was not a member of the conspiracy charged, then you must find the defendant not guilty, even though the defendant may have been a member of some other conspiracy. This is because proof that a defendant was a member of some other conspiracy is not enough to convict.

But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government proved that he was also a member of the conspiracy charged in the indictment.

R., Vol. II at 695.

> MATOS, did knowingly and intentionally conspire with each other and with persons known and unknown to the Grand Jury to distribute and possess with intent to distribute 400 grams and more of a mixture or substance containing a detectable amount of fentanyl, . . . and such substance, without authorization, bore an identifying mark that falsely purported the substance to be the product of Mallinckrodt, Inc..

R., Vol. VIII at 340.

Jury Instruction 19 repeated that section of the indictment verbatim. It also included a general instruction on conspiracies, instructing the jury that the government must prove beyond a reasonable doubt that

> two or more persons agreed to violate the federal drug laws by:
> (1) distributing or possessing with intent to distribute fentanyl, *or* (2) distributing or possessing with intent to distribute a counterfeit substance.

R., Vol. II at 692 (emphasis added). Holder claims that this is a misstatement that improperly amends his indictment. He argues that he was indicted for distributing a substance that both contained fentanyl *and* was counterfeit. By instructing the jury that the government must prove fentanyl *or* a counterfeit substance, Holder claims the district court allowed the indictment to be amended.

This misunderstands the law. "[T]his argument ignores the general rule that a crime may be proved in the disjunctive even if the indictment is phrased in the conjunctive*." United States v. Silva*, 889 F.3d 704, 717 (10th Cir. 2018). *Silva* is much like this case. There, we allowed a conviction for possession of guns *or* ammunition even though the indictment said guns *and* ammunition because the statute required only one, not both. *Id.* at 716–17. Since 12 U.S.C. § 841 makes it illegal "(1) to manufacture,

22

distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; *or* (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance," 12 U.S.C. § 841(a), the government may prove their case in the disjunctive.

Even if that were not true, there is no plain error in this case because the jury made special findings that Holder conspired to distribute both fentanyl and a counterfeit controlled substance. These findings eliminate any possibility that Holder was convicted of any crime other than the one with which he was charged. *See United States v. Bishop*, 469 F.3d 896, 903–04 (10th Cir. 2006) (finding harmless error where a jury's special findings showed conviction on the indicted facts), *overruled in part on other grounds by Gall v. United States*, 552 U.S. 38 (2007). Count One was not constructively amended when the government proved it in the disjunctive; even if it were, any error is harmless.

*Count Three*. The entire text of Count Three is relevant here:

## COUNT 3

**Distribution of Controlled Substance Resulting in Serious Bodily Injury**
**(21 U.S.C. § 841(a)(1) and (b)(1)(C))**

On or about December 26, 2017, within the State and District of Colorado, the defendant, BRUCE HOLDER, did knowingly and intentionally distribute a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, the use of which resulted in serious bodily injury to Z.G. on or about December 28, 2017.
All in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

R., Vol. I at 220.

23

The jury found Holder guilty of Count Three. But on the jury form, when asked if Holder's distribution resulted in serious bodily injury to Green, the jury checked "No." R., Vol. II at 714. The jury instructions here were clear that the jury had to find, beyond a reasonable doubt, first, that Holder distributed fentanyl and, if so, that distribution resulted in substantial bodily harm. After restating the indictment verbatim, the instructions specifically stated "[i]f you find Mr. Holder guilty of Count 2 or Count 3, then you must also decide, unanimously, whether death or serious bodily injury resulted from use of the fentanyl" and "the Government must prove beyond a reasonable doubt that but for the use of the fentanyl, the person would not have suffered serious bodily injury." R., Vol. II at 696–97.

In Holder's telling, the jury instructions lessened the government's burden because it was not required to prove bodily harm to find him guilty. Holder argues that the government is bound to prove that the distribution of fentanyl resulted in serious bodily injury because that language appears in the indictment. Not so.

A constructive amendment "must modify an essential element of the offense or raise the possibility the defendant was convicted of an offense other than that charged in the indictment." *United States v. DeChristopher*, 695 F.3d 1082, 1095 (10th Cir. 2012) (quotations and citations omitted). We have refused to find constructive amendment where jury instructions differed from the language of the indictment but did not modify the essential elements of the crime. In *United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015), for example, we accepted jury instructions that used the phrase "knowingly

24

participated" instead of "devised or intended to devise" because "[w]hether a person

devises or participates in the scheme is not an element of the offense." *Kalu*, 791 F.3d

at 1206 & n.16.

The elements of Holder's crime, 21 U.S.C. § 841(a), are to "knowingly or

intentionally . . . manufacture, distribute, or dispense, or possess with intent to

manufacture, distribute, or dispense, a controlled substance." § 841(a). Serious bodily

harm matters only because it increases the mandatory minimum sentence.[5]

§ 841(b)(1)(C). Serious bodily harm must be indicted and proven to apply the enhanced

sentence, but not to convict. As such, serious bodily harm is not a substantive element of

§ 841.

For this reason, the jury instruction does not constructively amend the indictment.

Like *Kalu*, the indictment here "detail[s] the precise acts at issue," but only charged

Holder with distribution of fentanyl. Instruction 22 is titled "COUNTS 2 & 3:

Distribution of a Controlled Substance." R., Vol. II at 696. The government proved the

---

[5] The relevant provision is found under the subheading "Penalties" and reads

> In the case of a controlled substance in schedule I or II . . . such person shall be sentenced to a term of imprisonment of not more than 20 years and *if death or serious bodily injury results from the use of such substance* shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18 or $1,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, or both.

21 U.S.C. § 841(b)(1)(C) (emphasis added).

essential elements of § 841: Holder distributed a controlled substance, and that substance was fentanyl. The government only had to prove serious bodily harm to apply the enhanced sentence under § 841(b)(1)(C). We have agreed with other circuits that failure to prove a § 841(b) factor affects only the sentence and does not undermine the conviction itself. *See United States v. Ellis*, 868 F.3d 1155, 1168 (10th Cir. 2017) (collecting cases). Holder has not shown that an essential element of the offense was modified. Nor did he demonstrate that the evidence or the jury instructions raise the possibility that he was convicted on a charge other than that alleged in the indictment. *See Kalu*, 791 F.3d at 1207.

In sum, Holder cannot show that the district court erred, let alone plainly erred and constructively amended Counts One or Three of his indictment.[6]

### D.    *Sufficiency of the Evidence*

The jury found Holder guilty of Count Two, distribution of fentanyl resulting in the death of Jon Ellington. Holder argues that there was insufficient evidence to convict him on this count. We review de novo, viewing the evidence in the light most favorable to the government. *United States v. Yurek*, 925 F.3d 423, 430 (10th Cir. 2019). "We will reverse only if no rational factfinder could have found

---

[6] Holder asks us to view any invited error in this claim as ineffective assistance of counsel. We decline. "Except in rare circumstances, '[i]neffective assistance of counsel claims should be brought in collateral proceedings, not on direct appeal.'" *United States v. Flood*, 635 F.3d 1255, 1260 (10th Cir. 2011) (quoting *United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir.1995) (en banc)). The district court did not rule on ineffective assistance of counsel and there is insufficient record for us to rule.

that the government had proven all of the elements of an offense beyond a reasonable doubt." *Id.* (citing *United States v. Brown*, 400 F.3d 1242, 1247 (10th Cir. 2005)).

The jury reasonably concluded that Holder's fentanyl resulted in Ellington's death.

Holder argues that the evidence is too remote to support a conviction. He argues that the chain of causation is too attenuated. The links are that Holder distributed to Huggett, who distributed to Green, who then distributed to Ellington, who overdosed. He points to *United States v. Robinson*, 167 F.3d 824 (3d Cir. 1999), for support. There, the court held "in some cases it is possible that the death or serious bodily injury which results from the use of a [controlled] substance may be so remote a consequence from the criminal conduct of the defendant with respect to the substance that a court might conclude that it would not be consistent with congressional intent to apply the mandatory 20-year minimum sentence." *Id.* at 831–32. But in that case the court affirmed a conviction where the heroin passed from the defendant through an intermediary to the user who died. That is precisely the case we have here except we have two intermediaries. One more person does not make Ellington's death "so remote a consequence." This is especially true here where Green only bought from Holder, or his co-conspirator, Huggett.

We have held, moreover, that 18 U.S.C. § 841(b)(1) requires only but-for causation, not proximate causation. *United States v. Burkholder*, 816 F.3d 607, 618 (10th Cir. 2016). "But-for" causation is simply a "cause without which the event could not have occurred." *Cause*, Black's Law Dictionary (12th ed. 2024).

27

Proximate cause, in contrast, is "[a] cause that is legally sufficient to result in liability." *Id.* Holder specifically disclaims that his argument is about foreseeability or proximate cause but still argues that his conduct is too remote because "Holder may have known Huggett was selling the pills, but he did not know who Huggett was selling to, did not know Green, did not know Ellington, and did not know that Huggett would sell to someone who would then sell to someone else." Op. Br. at 83–84. Whether Holder could have anticipated a third-party's death is textbook foreseeability and not required here.

Holder's final argument is that it is mere speculation that *his fentanyl* killed Ellington. He argues both that fentanyl may not have killed Ellington and that if it did, it may not have been fentanyl that he sold. He points to the other substances in Ellington's room and the attenuated chain of fentanyl distribution.

The jury reasonably concluded that fentanyl caused Ellington's death. After all, two coroners and the defense's own expert agreed that fentanyl was at least a cause of death. This testimony is sufficient to conclude that fentanyl was a but-for cause of Ellington's death.

So too the jury could find that the fentanyl that killed Ellington came from Holder. The government produced evidence that the fentanyl found in Ellington's room was the same blue pill with a "box M" that Holder was known for selling and Ellington bought the fentanyl from dealers who only bought from Holder. Perhaps most significantly, several witnesses testified that they did not know of any other

28

source of blue, box-M fentanyl pills.  It is not mere speculation that the fentanyl came from Holder.

The jury had sufficient evidence to convict Holder of distribution of fentanyl resulting in death.

## III.   Conclusion

Holder brings four distinct challenges to his convictions—none of which we find persuasive.  *First*, the district court's pandemic protocols did not violate Holder's public trial rights.  The courtroom's partial closure was justified by the court's substantial interest in protecting the health of the participants.  *Second*, Holder did not show any unreasonable racial underrepresentation the jury pool.  *Third*, the district court did not plainly err and allow Holder's indictment to be constructively amended.  The evidence and jury instructions did not alter the essential elements of the indictment.  *Lastly*, the jury had sufficient evidence that the fentanyl Holder distributed resulted in the death of Jon Ellington.

We affirm the conviction.